UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
|
MICHAEL PISANO,                                              |
|
Plaintiff,                          |
|        08 Civ. 1045 (KMW)
-against-                           |
|        <u>OPINION and ORDER</u>
ALEX MANCONE, individually and in his capacity |
as Chief of Police of the Village of Brewster, New |
York, JOHN DEGNAN, individually, WILLIAM    |
BANKS, individually, and the VILLAGE OF     |
BREWSTER, New York,                         |
|
Defendant.                          |
|
-------------------------------------------------------------X

KIMBA M. WOOD, U.S.D.J.:

Plaintiff Michael Pisano ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983

("Section 1983") against Defendants Alex Mancone, individually and in his capacity as Chief of

Police of the Village of Brewster, New York ("Chief Mancone"), John Degnan ("Mayor

Degnan"), individually, William Banks ("Trustee Banks"), individually, and the Village of

Brewster, New York (the "Village") (collectively, the "Defendants").  Plaintiff alleges that

Defendants collectively retaliated against him by terminating his employment with the Village of

Brewster Police Department ("VBPD"), in violation of Plaintiff's rights under the First

Amendment to the United States Constitution.

Defendants move, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule

56"), for summary judgment dismissing the complaint.  For the reasons stated below,

Defendants' motion is DENIED in part, and GRANTED in part, as to the Village, Chief

Mancone and Mayor Degnan, and is GRANTED as to Trustee Banks.

## I.      BACKGROUND

### A.      Factual Background

Unless otherwise noted, the following facts are undisputed and are derived from the parties' Local Rule 56.1 statements, affidavits, and other submissions.  The Court construes all evidence in the light most favorable to the non-moving party and draws all inferences in the non-moving party's favor.

Plaintiff is a former part-time Patrol Sergeant in the VBPD.  The Village is a municipal corporate subdivision of the State of New York.  Mayor Degnan was, at all times relevant to this action, the elected Mayor of the Village.  Trustee Banks was, at all times relevant to this action, an elected Trustee of the Village.  Chief Mancone served, at all times relevant to this action, as the Chief of Police of the VBPD.  Mayor Degnan and Trustee Banks were also Commissioners of the VBPD during this time.

Plaintiff was hired by the VBPD on December 6, 2006 as a Patrol Sergeant.[1]  On December 21, 2006, Chief Mancone issued a memorandum with the subject line "Chain of Command," stating that "All Departmental issues are to be handled through the chain of command with the mayor being the commissioner."  Defs. 56.1 Stmt. ¶ 9.  Plaintiff claims that he was neither shown this document nor specifically informed of this policy, but that he was generally aware of chain-of-command policies in police departments based upon his prior

---

[1] The parties dispute whether Plaintiff was initially hired for a one-year probationary period.  *See* Defendants' Joint Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 (hereinafter "Defs. 56.1 Stmt.") ¶ 7.  It is not necessary for the Court to resolve this dispute, because whether Plaintiff was hired on a probationary basis is immaterial to his claim.  "Even [where a plaintiff] was merely a probationary employee, and even if []he could have been discharged for any reason or for no reason at all, []he may nonetheless be entitled to reinstatement if []he was discharged for exercising h[is] constitutional right to freedom of expression."  *Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987).

experience as a police officer.  Plaintiff's Response to Defendant's Joint Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 (hereinafter "Pl. 56.1 Resp.") ¶ 9.

During his first several months working at the VBPD, Plaintiff raised certain complaints to Chief Mancone.  Affidavit of Mark K. Anesh in Support of Defendants' Joint Motion for Summary Judgment (hereinafter "Anesh Aff.") Ex. C, Affidavit of Alex Mancone (hereinafter "Mancone Aff.") ¶¶ 4-7.  The record is not clear with respect to the substance of all of the complaints that Plaintiff raised with Chief Mancone, or precisely when these conversations took place.  The parties agree that Plaintiff raised at least two specific complaints with Chief Mancone:

(1) that Chief Mancone had ordered officers to check the drivers' licenses of taxi drivers in the Village, and confiscate those licenses from out of state, which Plaintiff believed to be an unlawful order, Anesh Aff. Ex. C, Mancone Aff. ¶ 6; Anesh Aff. Ex. B, Transcript of Deposition of Michael Pisano (hereinafter "Pisano Dep.") at 81-82; and

(2) that VBPD Officer Wayne Peiffer ("Officer Peiffer") had not completed the requisite police academy training needed to become a certified police officer. Anesh Aff. Ex. C, Mancone Aff. ¶ 4; Pl. 56.1 Resp. ¶ 15.

On March 15, 2007, Plaintiff approached Mayor Degnan at Mayor Degnan's home to express various concerns regarding Chief Mancone and the VBPD.  Mayor Degnan then invited Trustee Banks, who was at that time his neighbor, to join the meeting.  Affidavit of Jane Bilus Gould in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Gould Aff.") Ex. 1, Pisano Dep. at 91.  At the meeting, Plaintiff alleged the following:

(1)  The VBPD did not have any departmental rules or policies in place.  Defs. 56.1 Stmt. ¶ 16.[2]

(2)  Chief Mancone had issued certain orders that Plaintiff believed to be unlawful.  In particular, Plaintiff took issue with Chief Mancone's orders to shut down unlicensed barber shops and arrest the employees.  Defs. 56.1 Stmt. ¶ 13.

(3)  Officer Peiffer had not completed the requisite police academy training, but was nevertheless wearing the uniform of a fully certified police officer and carrying a gun on patrol. Plaintiff expressed his view that this was unsafe to the public, and that other officers had expressed to him that they did not feel safe working with Officer Peiffer.  Defs. 56.1 Stmt. ¶ 15; Gould Aff. Ex. 1, Pisano Dep. at 82-83, 91-92.

(4)  Chief Mancone directed the alteration of VBPD payroll records in order to allow some part-time officers to work in excess of the weekly twenty-hour work limit for part-time officers.  Gould Aff. Ex. 1, Pisano Dep. at 83, 93.[3]

(5)  Chief Mancone was not legally appointed as chief of the VBPD because he had not taken a competitive civil service exam and was therefore not appointed from a certified civil

---

[2] Defendants vigorously dispute the truth of this allegation.  Defendants submit the Table of Contents of the Brewster Police Department Manual, the full text of which is on a compact disk. Anesh Aff. Ex. E.  Plaintiff contends that this document was a generic manual used by the City of New York, and was not used by the VBPD in practice.  Pl. 56.1 Resp. ¶ 17.  Because the validity of Plaintiff's complaint is ultimately immaterial to Plaintiff's claims, it is not necessary for the Court to resolve this dispute.  *See Cioffi v. Averill Park Central School District Board of Education*, 444 F.3d 158, 167 (2d Cir. 2006).

[3] The precise mechanism as to how this alleged scheme would work is not clear from the record or Plaintiff's testimony.  It appears that the scheme may have worked as follows:  An officer who was away on vacation would report that he worked during that time; while that officer was away, another officer who had already worked twenty hours would work an additional twenty hours; the officer on vacation would then pay the officer who worked in his stead, out of his pocket. Anesh Aff. Ex. B, Pisano Dep. at 83.  In any event, the parties do not dispute that Plaintiff raised his concern about this scheme in general, at the meeting with Mayor Degnan and Trustee Banks.

service eligible list, as required by the laws of the State of New York.  Defs. 56.1 Stmt. ¶ 14; Pl.

56.1 Resp. ¶ 5.[4]

It is not clear from the record how Mayor Degnan responded to each of these issues.  At

his deposition, he acknowledged that the issue regarding Officer Peiffer carrying a gun was "of

most concern" to him at the time.  Gould Aff. Ex. 2, Transcript of Deposition of John Degnan

(hereinafter "Degnan Dep.") at 37.

On April 17, 2007, approximately one month after Plaintiff's meeting with the Mayor,

Plaintiff's job was terminated by a letter signed by Chief Mancone.  Defs. 56.1 Stmt. ¶ 20.  The

letter stated, in relevant part, "By authority of the Village Board of Trustees of the Village of

Brewster, New York under color of my authority as Chief of Police of the Village of Brewster

Police Department ('VBPD'), your position as probationary police officer is hereby terminated,

effective immediately."  Anesh Aff. Ex. J.  The letter indicates that copies were sent to the Board

---

[4] Plaintiff submits evidence suggesting that this concern was valid.  In particular, Plaintiff includes a letter from Paul Eldridge, Personnel Director for Putnam County, New York, to Mayor Degnan, dated December 21, 2006, which advises Mayor Degnan that "it would . . . appear that Mr. Mancone cannot be the Chief of Police for the Village of Brewster Police Department since he has not received a permanent competitive civil service appointment as a Police Officer."  Gould Aff. Ex. 7.  Mr. Eldridge appears to have based this conclusion on a letter dated December 14, 2006 that he received from Amy M. Rodak, of the Municipal Service Division of the State of New York Department of Civil Services.  Gould Aff. Ex. 10.  That letter states that because Police Chiefs must meet the requirements of New York Civil Service Law, "the position of Police Chief shall be in the competitive class," and must be filled from an "eligible list established according to merit and fitness as provided by section six of article five of the constitution of the State of New York . . . ."  *Id.*  The letter instructed Mr. Eldridge to inform the Village of these requirements.  *Id.*  Plaintiff also submits news articles covering the issue in the *Journal News*, a newspaper covering the Lower Hudson Valley region.  The first article, dated August 19, 2007, states that the Putnam County Personnel Department "has taken village officials to task over some police supervisors it says require Civil Service testing."  Gould Aff. Ex. 6.  The second, dated March 2, 2009, states that then-Mayor James Schoenig asked Chief Mancone to resign from his position, and states that the position was "being eliminated to comply with Putnam County's Civil Service requirements."  Gould Aff. Ex. 4.  As of the filing of his affidavit with the instant motion, Chief Mancone was no longer chief of police and was instead employed as the Director of Community Relations for Police Officers for the VBPD. Anesh Aff. Ex. C, Mancone Aff. ¶ 1.

of Trustees of the Village, and to Gary T. Kropkowski, Esq., Village Attorney.  Chief Mancone

testified that he made the decision to terminate Plaintiff after speaking to Mayor Degnan and Mr.

Kropkowski.  Anesh Aff. Ex. C, Mancone Aff. ¶ 8.

      The parties disagree as to the reason Plaintiff was terminated.  Defendants state that

Plaintiff was terminated because his speaking to the Mayor about department issues was "in

direct conflict with the VBPD's written policies and procedures, in failing to follow the chain of

command."  Defs. 56.1 Stmt. ¶ 20.  Chief Mancone also testified that complaints that Plaintiff

made to him affected morale within the VBPD, caused "animosity [to] spread throughout the

Department," and "caused significant friction within the Department."  Anesh Aff. Ex. C,

Mancone Aff. ¶¶ 4, 7.  A form sent from the Village to the New York State Department of Labor

("DOL") regarding Plaintiff's unemployment benefits stated that Plaintiff was fired for

"insubordination."  Anesh Aff. Ex. K.  The form also noted that Plaintiff would have known his

actions would cause his discharge because he committed an "[a]ction against written chain of

command policy."  *Id.*

      On June 8, 2007, the DOL sent Plaintiff a letter stating that unemployment benefits

would not be paid because Plaintiff was "discharged for misconduct in connection with [his]

employment."  Gould Aff. Ex. 9.  In the section entitled "Reason," the DOL letter stated as

follows:

> You were discharged from employment at Brewster Police Department due to
> insubordination.  It has been confirmed that you have presented negative
> information to the Mayor about the police department and you did not properly
> use the written chain of command.  As a result of this you were dismissed for
> insubordination by the Chief of Police.

*Id.*

      Some time after April 17, 2007, but before June 2007, Plaintiff met with Mayor Degnan.

Defs. 56.1 Stmt. ¶ 22.  The parties dispute what was said at this meeting.  Mayor Degnan claims

that Plaintiff told him that if he was terminated for insubordination "[he would] never be able to work again as a police officer."  Defs. 56.1 Stmt. ¶ 22.  Plaintiff claims that he simply said that he did not understand why he was terminated and that he would like to return to work.  Pl. 56.1 Resp. ¶ 22; Gould Aff. Ex. 1, Pisano Dep. at 100.  Plaintiff claims that Mayor Degnan responded, "there are heavy weights and there are light weights.  You are a heavy weight so I'm going to intervene, and I'm going to try to get you back."  *Id*.  Mayor Degnan testified that he decided to help Plaintiff, in part because of his recollection of Plaintiff "walking the beat in the middle of a snowstorm," and that Plaintiff "struck [Mayor Degnan] as someone who . . . wanted to see the community represented in a professional manner."  Gould Aff. Ex. 2, Degnan Dep. at 53-54.  The Mayor then met with Chief Mancone and other VBPD officials and requested that Plaintiff be reinstated.  Defs. 56.1 Stmt. ¶ 22-23; Gould Aff. Ex. 2, Degnan Dep. at 53-54; Anesh Aff. Ex. C, Mancone Aff. ¶ 10.

Thereafter, in June of 2007, Plaintiff was re-hired by the VBPD, and was soon promoted to the rank of "Detective."  Defs. 56.1 Stmt. ¶ 24; Anesh Aff. Ex. C, Mancone Aff. ¶¶ 11-12.

On July 12, 2007, Plaintiff's job was terminated a second time.  Defs. 56.1 Stmt. ¶ 25. The termination letter states:

> The Village of Brewster Police Department is exceeding current budgetary constraints and forcing us to take action to prevent overruns from occurring.  It is therefore necessary to terminate your employment immediately, effective July 12, 2007.  We regret this action is necessary and wish you well in all your future endeavors.
>
> Sincerely,
> Alex Mancone
> Chief of Police

Anesh Aff. Ex. L.  Chief Mancone did not sign the letter, although his name is typed as the signatory.  The letter shows that a copy was sent to Mayor Degnan.[5]

The parties dispute the reasons for, and the circumstances of, Plaintiff's second termination.  Defendants state that the VBPD required additional funds to purchase needed materials, including a particular SUV truck, and that Plaintiff was terminated for budgetary reasons.  Defs. 56.1 Stmt. ¶¶ 25-27.  Plaintiff contends that this dismissal was part of the same retaliation for his protected speech as his first dismissal.  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Pl. Opp.") at 7.  It is undisputed that Plaintiff was the only employee of the VBPD who was terminated in July 2007. Gould Aff. Ex. 3, Transcript of Deposition of Alex Mancone (hereinafter "Mancone Dep.") at 146.  It is also undisputed that within several months after Plaintiff was terminated, and during the same budgetary cycle, the VBPD hired additional police officers.  Pl. 56.1 Resp. ¶ 25; Gould Aff. Ex. 3, Mancone Dep. at 146-48.

### B.    Procedural History

The procedural history of this case is further detailed in Judge Chin's prior opinion, familiarity with which is assumed.  *See Pisano v. Mancone, et al*, No. 08 Civ. 1045, 2009 WL 2337131 (S.D.N.Y. July 30, 2009) (Dckt. No. 34).

Plaintiff initiated this Section 1983 action for compensatory and punitive damages in February 2008.  The Complaint alleges that the Defendants colluded in terminating Plaintiff's job as Patrol Sergeant of the VBPD in retaliation for Plaintiff's criticizing Chief Mancone and

---

[5] Chief Mancone claims that he did not draft the letter and was not aware of the decision to terminate Plaintiff a second time until the day the termination occurred.  Anesh Aff. Ex. C, Mancone Aff. ¶ 14.  Given that Chief Mancone's name is typed as the signatory, there is at least a genuine issue of fact as to his involvement in the termination.

the VBPD to Mayor Degnan and Trustee Banks.  Plaintiff alleges that his criticism was protected by the First Amendment.[6]

All of the Defendants except Chief Mancone filed a motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Defendants' Motion contended that (1) Plaintiff's speech was not protected under the First Amendment because it related to his official duties as an employee; (2) Plaintiff failed to plead any facts required to hold a municipality liable for the acts of its officials; and (3) Degnan and Banks were entitled to qualified immunity.

Judge Chin denied the motion to dismiss in an order entered on July 30, 2009.  He ruled that Plaintiff adequately stated a claim that he suffered retaliation for engaging in protected speech.  Judge Chin also found that the municipality could be found liable because "it is plausible that [Chief Mancone] had final policymaking authority over employee discharge decisions."  *Pisano*, 2009 WL 2337131, at *5.  Finally, Judge Chin found that Plaintiff's allegations that Mancone, Degnan and Banks colluded to deprive Plaintiff of his First Amendment rights, if established, would deprive Defendants of qualified immunity.

The parties subsequently engaged in discovery, and in October 2009, Defendants filed an Answer to Plaintiff's Complaint.

On March 18, 2010, all of the Defendants filed the instant joint motion for summary judgment.  Defendants argue that (1) Plaintiff failed to establish a prima facie case for First Amendment retaliation; (2) Plaintiff failed to establish a *Monell* claim against the Village; and

---

[6] At that time, the case was before Hon. Stephen C. Robinson.  It was transferred to Hon. Denny Chin, on June 5, 2009.  Upon Judge Chin's appointment to the Second Circuit Court of Appeals, the case was reassigned to this Court on May 12, 2010.

(3) Defendants Chief Mancone, Trustee Banks and Mayor Degnan are entitled to qualified immunity from liability.

## II.      LEGAL STANDARDS

### A.      Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).  A "material" fact is one that might "affect the outcome of the suit under the governing law."  *Id.*  The moving party bears "the burden of demonstrating that no material fact exists."  *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

In resolving this inquiry, the Court must construe "the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50, 255 (1986)).  In opposing the motion for summary judgment, the non-moving party may not rely on "conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), or on mere denials or unsupported alternative explanations of its conduct.  *See S.E.C. v. Grotto*, No. 05-5880, 2006 WL 3025878, at *7 (S.D.N.Y. Oct. 24, 2006).  Rather, the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor.  *Anderson*, 477 U.S. at 255.  To avoid summary judgment, all that is required of the non-moving party is a showing of sufficient evidence supporting the claimed factual dispute as to require a judge or jury's resolution of the parties'

differing versions of the truth.  *See Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (citing *Anderson*, 477 U.S. at 248-49).

**B.      Section 1983 Standard**

To prevail on a claim under Section 1983, a plaintiff must establish that (1) the conduct complained of was committed by a person acting under color of law; and (2) the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Dev. Agency*, 77 F.3d 26, 29-30 (2d Cir. 1996); *see also Am. Mfrs. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).  A plaintiff must also show that each defendant was "personally involved—that is, he directly participated—in the alleged constitutional deprivations." *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005).  This requires showing "intentional participation in the conduct . . . by one who knew of the facts rendering it illegal."  *Id.* (quoting *Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir.2001)).

**III.     ANALYSIS**

**A.  Section 1983 Liability**

The Court finds that if Plaintiff prevails on the substance of his claims, Defendants, Chief Mancone and Mayor Degnan can be liable under Section 1983.[7]  The record is clear that these defendants were "personally involved . . . in the alleged constitutional deprivations."  *Gronowski*, 424 F.3d at 293.  *See* Anesh Aff. Ex. C, Mancone Aff. ¶ 8; Gould Aff. Ex. 3, Mancone Dep. at 93-94.

By contrast, there is no evidence in the record to demonstrate any personal involvement on the part of Trustee Banks in any alleged constitutional deprivation.  There is no dispute that

---

[7] The liability of the Village of Brewster has also been established, as discussed *infra* at Section III.B.

Banks was present at the meeting with Plaintiff and Mayor Degnan, at which Plaintiff expressed the criticisms that give rise to his retaliation claim.  *See* Defs. 56.1 Stmt. ¶ 11.  However, there is no evidence of Trustee Banks' involvement in any decisions or other events related to this suit, and in particular, there is no evidence that shows that he was in any way involved with the decision to terminate Plaintiff.  Without any evidence showing personal involvement, Trustee Banks cannot be found liable under Section 1983.

Neither Trustee Banks nor any other Defendant moved for summary judgment on this ground, but the Court *sua sponte* GRANTS summary judgment to Trustee Banks on the ground that Plaintiff has not shown a genuine issue of material fact as to whether Trustee Banks had any personal involvement in the alleged constitutional deprivation.  *See First Fin. Ins. Co. v. Allstate Interior Demolition Corp*., 193 F.3d 109, 114, 119 (2d Cir. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)) (noting that district courts possess the power to enter summary judgment *sua sponte*).

### B.       First Amendment Retaliation

#### 1.       Background Legal Principles

This case requires the Court to address the tension between a public employee's First Amendment right to speak about matters affecting his workplace, and a public employer's authority to control that speech.   On the one hand, a person does not give up his or her constitutional rights upon accepting a government job.  It is now well settled that the state "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142 (1983)  *See also id*. at 140 ("[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment.").  On the other hand, courts

have also long recognized that the government's interests in regulating the speech of its

employees "differ significantly from those it possesses in connection with regulation of the

speech of the citizenry in general." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  This is

because

> [g]overnment agencies are charged by law with doing particular tasks.  Agencies
> hire employees to help do those tasks as effectively and efficiently as possible.
> When someone who is paid a salary so that []he will contribute to an agency's
> effective operation begins to do or say things that detract from the agency's
> effective operation, the government employer must have some power to restrain
> [him].

*Waters v. Churchill*, 511 U.S. 661, 674-75 (1994).

In cases in which public employees have alleged employer retaliation for engaging in

constitutionally protected expression, the Supreme Court has attempted to resolve these

competing interests by applying a balancing test.  As the Court has explained, the goal is to

effectively balance "the interests of the [employee], as a citizen, in commenting upon matters of

public concern and the interest of the State, as an employer, in promoting the efficiency of the

public services it performs through its employees." *Pickering*, 391 U.S. at 568.  In effectuating

that balance, courts are expected to exercise "[v]igilance . . . to ensure that public employers do

not use authority over employees to silence discourse, not because it hampers public functions

but simply because superiors disagree with the content of employees' speech." *Rankin v.

McPherson*, 483 U.S. 378, 384 (1987).

Complicating this balancing is the fact that "the interest at stake is as much the public's

interest in receiving informed opinion as it is the employee's own right to disseminate it." *City of

San Diego v. Roe*, 543 U.S. 77, 82 (2004).  The Court has recognized that "free and unhindered

debate on matters of public importance" is "the core value of the Free Speech Clause of the First

Amendment." *Pickering*, 391 U.S. at 572.  *See Mills v. Alabama*, 384 U.S. 214, 218-19 (1966)

13

("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes."); *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964) ("For speech concerning public affairs is more than self-expression; it is the essence of self-government.").  The expression of public employees is particularly important to this process because "[g]overnment employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions."  *Waters*, 511 U.S. at 674.  *See also Roe*, 543 U.S. at 82 ("[P]ublic employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public.  Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues.") (citing *Pickering*, 391 U.S. at 572).  Thus, a court ruling on a First Amendment retaliation case must remain cognizant of both the public and private interests at stake.

In 2006, the Supreme Court stated that the balancing approach first introduced in *Pickering v. Board of Education* remained intact, but added a restriction that denied protection where the employee had spoken "pursuant to [his] official duties."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  The Plaintiff in *Garcetti* was a prosecutor who believed that an affidavit supporting a search warrant in a particular prosecution contained misrepresentations.  *Id.* at 414.  The prosecutor, Richard Ceballos, wrote a memorandum to his superiors explaining the situation and recommending dismissal of the case, and he was later called to testify on behalf of the

defense during a challenge to the warrant.  *Id.*  Thereafter, Ceballos was allegedly "subjected to a series of retaliatory employment actions."  *Id.* at 415.

Citing the principle from *Pickering* that the First Amendment protects speech made "*as a citizen* . . . [on] matters of public concern," 391 U.S. at 568 (emphasis added), the Court held that because writing such memos was "part of what [plaintiff], as a calendar deputy, was employed to do," any restriction of that speech "does not infringe any liberties the employee might have enjoyed as a private citizen."  *Id.* at 421-22.  It was merely "the exercise of employer control over what the employer itself has commissioned or created."  *Id.* at 422.[8]

Because the parties in *Garcetti* conceded that the employee spoke pursuant to his duties, the Supreme Court noted that it did not have occasion to articulate a "comprehensive framework" for determining whether a government employee is speaking as a citizen or as an employee.  *Id.* at 424.  The Court described speech made "pursuant to . . . official duties" as speech that "owes its existence to a public employee's professional responsibilities."  547 U.S. at 421.  The Court explained that the inquiry whether speech was pursuant to official duties should be "a practical one," and pointed out that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that

---

[8] The majority's assumptions and logic in *Garcetti* were viewed with deep skepticisim by the four dissenting Justices, Justices Souter, Stevens, Breyer and Ginsburg.

One criticism made by the dissenters was that, under the majority's logic, "a schoolteacher is protected when complaining to the principal about [discrimination in hiring non-teaching staff], but a school personnel officer would not be [protected if he made the same complaint]," which, they asserted, was an "an odd place to draw a distinction."  547 U.S. at 430 (Souter, J., with whom Stevens, J., and Ginsburg, J., join, dissenting).  Justice Souter explained that, on the contrary, "[t]he need for a balance hardly disappears when an employee speaks on matters his job requires him to address; rather, it seems obvious that the individual and public value of such speech is no less, and may well be greater, when the employee speaks pursuant to his duties in addressing a subject he knows intimately for the very reason that it falls within his duties."  *Id.* at 430-31.

conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id*. at 424-25.

At the same time, the Court was also clear that neither the fact that "Ceballos expressed his views inside his office, rather than publicly," nor that "the memo concerned the subject matter of Ceballos' employment" was dispositive. *Id.* at 420. In fact, the Court expressly reaffirmed the holdings of *Pickering* and *Givhan v. Western Line Consolidated School District*, 439 U.S. 410 (1979), that "[t]he First Amendment protects some expressions related to the speaker's job," and recognized in particular that public employee speech on the subject matter of their jobs makes an important contribution to public discourse and the democratic process. *Garcetti*, 547 U.S. at 421 (citing *Pickering*, 391 U.S. at 572; *Givhan*, 439 U.S. at 414).

### 2.      Prima Facie Case

A plaintiff must make the following showing in order to establish a prima facie case of First Amendment retaliation under Section 1983: (1) he engaged in constitutionally protected speech; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected speech and the adverse employment action. *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004). If the Plaintiff makes a sufficient showing on each of these elements, summary judgment for the defendant is not appropriate unless the defendant can establish as a matter of law either of two defenses: (1) the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's conduct, *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); or (2) the plaintiff's expression was likely to disrupt the government's activities, and that the harm caused by the disruption outweighs the value of the plaintiff's expression, *see Pickering*, 391 U.S. at 568. *See Anemone v. Metro. Trans. Auth.*, 629 F.3d 97, 114-15 (2d Cir. 2011) (outlining the availability of these two

defenses).  *See also Garcetti*, 547 U.S. at 419 (explaining that if the employee has a First

Amendment claim "[t]he question becomes whether the relevant government entity had an

adequate justification for treating the employee differently from any other member of the general

public" (citing *Pickering*, 391 U.S. at 568)).

The application of these tests is generally a matter of law for the court to decide, but in

some instances, questions of fact will need to be resolved by a factfinder before the court can

apply the test.  *See Johnson v. Ganim*, 342 F.3d 105, 114-15 (2d Cir. 2003) (citing *Gorman-

Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 557 (2d Cir. 2001)).

### a.      Was the Speech Protected?

When analyzing a First Amendment retaliation claim, the Court must focus, as a

threshold matter, on whether the underlying speech was protected by the Constitution.  *See Sousa

v. Roque*, 578 F.3d 164, 169-70 (2d Cir. 2009) ("It is established law in this Circuit that,

regardless of the factual context, we have required a plaintiff alleging retaliation to establish

speech protected by the First Amendment." (citation omitted)).  As the Supreme Court has

explained, this entails looking first to "whether the employee spoke as a citizen on a matter of

public concern."  *Garcetti*, 547 U.S. at 418.  Under *Connick* and *Garcetti*, this inquiry has two

prongs:  (1) whether the employee spoke on a matter of public concern; and (2) whether the

employee spoke "as a citizen," rather than in his capacity as a public employee.

Whether an employee's speech addresses a matter of public concern is a question of law

to be determined based on the "content, form and context of a given statement, as revealed by the

whole record."  *Lewis v. Cowen,* 165 F.3d 154, 163 (2d Cir. 1999) (citing *Connick,* 461 U.S. at

147-48 and n. 7).  A matter of public concern is one that relates to "any matter of political,

social, or other concern to the community," as opposed to one that addresses merely personal

employee grievances.  *Connick*, 461 U.S. at 146.  Courts look also to whether an issue is "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication [of the speech]."  *Roe*, 543 U.S. at 83-84.  Although the speaker's motive can be relevant to the inquiry, it is "not dispositive in determining whether speech is on a matter of public concern."  *Sousa*, 578 F.3d at 166 (quoting *Reuland v. Hynes*, 460 F.3d 409, 411 (2d Cir. 2006)).

Whether speech was expressed in private or in public is not dispositive of whether the speech addressed a matter of public concern.  *See Rankin*, 483 U.S. at 387 n.11 (citing *Givhan*, 439 U.S. at 414-16).  In addition, the Second Circuit has held that the truth or falsity of the statements does not bear on "whether the speech is personal or public."  *Cioffi*, 444 F.3d at 167.

The test for whether an employee engaged in speech "pursuant to his official duties" is "a practical one."  *Garcetti*, 547 U.S. at 424.  The court is to look beyond "formal job descriptions" to determine if the speech was "part of what [the plaintiff] was employed to do," by looking to whether the speech "owes its existence to [the] public employee's professional responsibilities."  *Id.* at 421.  The Second Circuit has defined speech pursuant to official duties as speech that is "in furtherance of such duties."  *Weintraub v. Board of Education*, 593 F.3d 196, 202 (2d Cir. 2010).  Specifically, under the Second Circuit's decision in *Weintraub*, a court must look to whether an employee's speech could be viewed as "part-and-parcel of [the employee's] concerns about his ability to properly execute his duties."  *Id.* at 203.  District courts in this Circuit have identified several factors for analyzing the question, none of which is dispositive on its own, including: the plaintiff's job description; the persons to whom the speech was directed; and whether the speech resulted from special knowledge gained through the plaintiff's employment.  *Brady v. County of Suffolk*, 657 F. Supp. 2d 331, 342 (E.D.N.Y. 2009) (citing *Caraccilo v. Vill. of Seneca Falls*, 582

F. Supp. 2d 390, 405 (W.D.N.Y. 2008)).  *See also Adams v. New York State Educ. Dep't*, No. 08

Civ. 5996, 2010 WL 4742168, *36 (S.D.N.Y. Nov. 18, 2010).  The Second Circuit has also

looked to whether the speech has a "relevant analogue to speech by citizens who are not

government employees."  *Weintraub*, 593 F.3d at 203-04 (quoting *Garcetti*, 547 U.S. at 424).

### b.    Was There Causation Between Plaintiff's Speech and the Adverse Employment Action?

To establish the causation element of a prima facie case, a plaintiff must show that the

protected speech was "a substantial motivating factor in the adverse employment action."

*Sassone v. Quartararo*, 598 F. Supp. 2d 459, 467 (S.D.N.Y. 2009) (quoting *Cioffi*, 444 F.3d at

167).  A plaintiff may establish causation directly, or he may establish it indirectly through

circumstantial evidence, by showing that the employee's speech was "closely followed in time

by the adverse employment decision."  *Cioffi,* 444 F.3d at 168.  There is no bright line rule in

this Circuit for how close in time the adverse employment action must follow the protected

speech, but "there is . . . substantial authority holding that a period between five and six months

is sufficient."  *Anderson v. State of New York, Office of Court Admin. of Unified Court System*,

614 F. Supp. 2d 404, 430 (S.D.N.Y. 2009).  As a general rule, "[s]ummary judgment is

precluded where questions regarding an employer's motive predominate in the inquiry regarding

how important a role the protected speech played in the adverse employment decision."  *Morris

v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (citing *Piesco v. City of New York*, 933 F.2d 1149,

1155 (2d Cir. 1991)).

### 3.    Application of *Prima Facie* Test

### a.    The Plaintiff Engaged In Protected Speech

The Court first addresses the threshold question of whether Plaintiff engaged in protected speech.  If he did not, "that ends the matter."  *Brady*, 657 F. Supp. 2d at 342 (quoting *Caraccilo*, 582 F. Supp. at 405).

Defendants contend that Plaintiff's speech was not protected because he spoke pursuant to his official duties as a police officer, and therefore did not speak as a citizen on a matter of public concern.  Viewing the evidence in the light most favorable to the Plaintiff, the Court finds that Plaintiff did engage in some protected speech, and therefore DENIES in part, and GRANTS in part, Defendants' motion for summary judgment on this ground.

Specifically, when Plaintiff complained that Chief Mancone was not legally eligible to be chief of the VBPD, he "spoke as a citizen on a matter of public concern," and therefore engaged in speech protected by the First Amendment.  *Garcetti*, 547 U.S. at 418.

First, given the "content, form and context" of Plaintiff's statements, his speech regarding Chief Mancone's eligibility addressed issues of "political, social, or other concern to the community."  *Connick*, 461 U.S. at 147.   Plaintiff alleged that Chief Mancone was ineligible to occupy his office because he had not taken a competitive civil service exam and was not appointed from a certified civil service eligible list.  Courts have long recognized the importance of the integrity of the civil service system to the proper functioning of our government, particularly in the state of New York. *See Kirkland v. New York State Dept. of Correctional Services*, 520 F.2d 420, 428 (2d Cir. 1975) ("To the citizens of the State of New York, civil service was sufficiently important that they mandated its use by their constitution.  In so doing, they declared in unmistakeable terms that merit, ascertained as therein provided, shall govern appointments and promotions in the public service, and that merit must be ascertained as far as practicable by competitive examination." (internal quotation marks omitted)).  Justice Douglas

noted that "[t]he civil service system has been called the one great political invention of nineteenth century democracy," and expressed concern that lack of public confidence in the "objectivity and integrity" of the system could "jeopardize the effectiveness of administrative government." *United Public Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75, 121-122 (1947) (Douglas, J., dissenting). *See also Connick*, 461 U.S. at 149 ("[T]here is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service."). The Second Circuit has also noted the heightened public interest in the civil service system in the context of the police force. *N.A.A.C.P., Inc. v. Town of East Haven*, 70 F.3d 219, 223 (2d Cir. 1995) ("It cannot be gainsaid that the hiring of police officers and firefighters is in the public interest."). The newspaper articles that Plaintiff submits further demonstrate that the issue of Chief Mancone's alleged ineligibility to serve as Chief was "a subject of legitimate news interest," and was therefore "of value and concern to the public." *Roe*, 543 U.S. at 83-84. *See* Gould Aff. Exs. 4, 6.

The Court further finds that when Plaintiff complained that Chief Mancone was not legally eligible to be Chief of the VBPD, Plaintiff spoke in his capacity as a citizen. As an initial matter, Plaintiff engaged in speech for which there is a "relevant citizen analogue." *Weintraub*, 593 F.3d at 203. Plaintiff approached local, elected officials to discuss this issue of public concern. In *Weintraub*, the Second Circuit specifically noted that a "complaint to an elected representative or inspector general" is speech that is "available to non-employee citizens." 593 F.3d at 204. The fact that the Mayor also retained ultimate supervisory authority over the VBPD does not change the fact that ordinary citizens could approach the Mayor in this manner.

Defendants argue that Plaintiff made his complaints "internally, instead of externally communicating his concerns of alleged public importance." Joint Memorandum of Law

Submitted on Behalf of Defendants Alex Mancone, John Degnan, William Banks, and the Village of Brewster in Support of Their Motion for Summary Judgment (hereinafter "Def. Mem.") at 15.  But this is not supported by the record.  Plaintiff approached Mayor Degnan at Mayor Degnan's *home* for an unscheduled meeting.  Anesh Aff. Ex. B, Pisano Dep. at 90.  This is easily distinguishable from cases such as *Huth v. Haslan*, where the plaintiff raised concerns about other employees' unlawful behavior at daily office meetings, the purpose of which was to discuss the employees in her division with the head of her division.  598 F.3d 70, 74 (2d Cir. 2010).  Moreover, as Judge Chin pointed out in his opinion denying Defendants' motion to dismiss, "Defendants' claim that they fired Pisano because he broke the chain-of-command actually supports Pisano's argument that he was not speaking pursuant to his duty, as breaking the chain-of-command would presumably violate one of Pisano's duties."  *Pisano*, 2009 WL 2337131, at *9 n.3.[9]

In any event, it is important to note that there is not a *per se* rule that all speech that is spoken within the chain of command is unprotected.  Prior decisions are consistent in holding that it is "when a public employee raises complaints or concerns up the chain of command at his workplace *about his job duties*," that the speech is not protected.  *Davis*, 518 F.3d at 313 (emphasis added).  *See also Thompson v. District of Columbia*, 530 F.3d 914, 916 (D.C. Cir. 2008) ("Ordinarily, employees who make recommendations to their supervisors *on subjects directly related to their jobs* are carrying out their official duties and thus receive no First Amendment protection." (emphasis added)).  Indeed, the most critical inquiry remains whether

---

[9] The Court acknowledges that the Plaintiff himself has stated that he did not move outside the chain of command by raising his complaints with the mayor.  Pl. 56.1 Resp. ¶ 20.  It is not necessary to resolve this dispute at this stage of the proceedings.  There is a genuine issue of fact whether, and to what extent, Plaintiff was in violation of his duties when he raised his criticisms with the mayor.  And given that, the Court cannot conclude as a matter of law that Plaintiff was simply raising his concerns "internally."

the speech is actually "in furtherance of [the employee's] duties."  *Weintraub*, 593 F.3d at 202.

*See Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009) ("[W]e have consistently held that a

public employee speaks without First Amendment protection when he reports conduct that

interferes with his job responsibilities, even if the report is made outside his chain of

command.").  Accordingly, the fact that Plaintiff's audience was comprised of his ultimate

superiors is not dispositive of whether all of his speech was made pursuant to his official duties.

It remains necessary to examine the content of his speech as it relates to his own job duties and

responsibilities, to determine if the speech was made "in furtherance" of Plaintiff's duties.

  The Court concludes that when Plaintiff expressed his concerns that Chief Mancone was

not lawfully appointed to be Chief of Police, he was not speaking pursuant to his duties as a

police officer.  The fact that this issue was still broadly related to his job is not dispositive.

*Garcetti*, 547 U.S. at 421 ("The First Amendment protects some expressions related to the

speaker's job.").  Unlike other issues that Plaintiff raised, the issue of whether or not Chief

Mancone was fit to serve as Chief of Police under the state's civil service rules encompasses

issues of public concern far beyond the scope of Plaintiff's ability to properly execute his duties.

Although the competence of a police chief may ultimately affect issues of public safety that fall

within the core duties of a police officer, there is no evidence that the lawfulness of an

appointment under civil service laws fell within the scope of what Plaintiff would have had any

duty or responsibility to report. [10]  *Cf. Paola v. Spada*, 372 Fed. Appx. 143, 144 (2d Cir. 2010)

(finding that report to the Internal Affairs department of police department was not protected

---

[10] A helpful comparison may be drawn to the Personnel Director of the county who wrote the
letter to Mayor Degnan regarding the Village's compliance with state civil service requirements.
Presumably, that letter could not give rise to a viable retaliation claim by the personnel director,
because a municipality's compliance with civil service requirements is directly within his job
responsibilities.  There is no evidence that Plaintiff had similar responsibilities.

because under employee manual "state troopers *must* report potential wrongdoing either up the

chain of command or to an Internal Affairs officer" (emphasis added)); *Anemone*, 629 F.3d at

116 (holding that security director's speech to district attorney alleging corruption to district

attorney was within his duties when he conceded that he "regularly interacted with District

Attorneys' offices and viewed cooperating with these offices as among his duties"); *Healy v.

City of New York Dep't of Sanitation*, 286 Fed. Appx. 744, 746 (2d Cir. 2008) (holding that

report based on inventory check performed *at direction of his superiors* was within plaintiff's

official duties).

 It is also relevant that there is no evidence demonstrating that Plaintiff's concern about

the lawfulness of Chief Mancone's appointment was the result of "special knowledge of the

situation" that he gained as a police officer. *Brady*, 657 F. Supp. 2d at 334. Any citizen could

potentially have had knowledge of the circumstances of Chief Mancone's appointment. Indeed,

Plaintiff submits a December 2006 letter from the Putnam County Personnel Director to Mayor

Degnan expressing precisely the concern that Plaintiff reiterated at his meeting with Mayor

Degnan. Gould Aff. Ex. 7. He also submits published news articles on the issue from August

2007 and March 2009, demonstrating that the issue was of broad concern to the citizenry. Gould

Aff. Exs. 4, 6.

 By contrast, the other concerns raised by Plaintiff at the meeting with Mayor Degnan and

Trustee Banks do not qualify for protection under *Garcetti* and *Weintraub*. Specifically, at the

meeting with Mayor Banks and Trustee Degnan, Plaintiff made the following additional

criticisms: (1) the VBPD did not have any departmental rules or policies; (2) Chief Mancone

was issuing allegedly unlawful orders; (3) Officer Peiffer was not qualified to serve as a

uniformed police officer; and (4) Chief Mancone had directed the improper alteration of payroll

records.  Although, it is likely that these topics were all matters of public concern,[11] the Court

need not reach that issue, because even if that speech addressed matters of public concern, it is

not protected because Plaintiff was speaking "pursuant to [his] official duties."  *Garcetti*, 547

U.S. at 421.

The four topics referenced immediately above (the "Four Topics") concerned the internal

workings of the police department, as well as issues of public safety.  This speech was "in

furtherance" of Plaintiff's duties as a police sergeant, in that it was "part-and-parcel of his

concerns about his ability to properly execute" those duties.  *Weintraub*, 593 F.3d at 203.  The

Second Circuit has specifically commented that "a police officer speaking to a public official

about his concerns over public safety issues is speaking in his capacity . . . as a police officer."

*Platt v. Village of Southhampton*, 391 Fed. Appx. 62, 64 (2d Cir. 2010).  Thus, Plaintiff's speech

concerning these Four Topics is not protected under *Garcetti* and *Weintraub*.  Accordingly, the

Court GRANTS, in part, summary judgment to Defendants, and holds that Plaintiff's speech

concerning these Four Topics is not speech protected by the First Amendment.  However,

because Plaintiff did engage in some protected speech, the Court will proceed to the next step of

the First Amendment retaliation inquiry.

> **b.**     **Plaintiff Established Prima Facie Causation Between His Speech and the Adverse Employment Action**

---

[11] *See Johnson*, 342 F.3d at 112-13 (noting that "discussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern"); *Munafo v. Metropolitan Transp. Authority*, 285 F.3d 201, 212 (2d Cir. 2002) (holding that "safety in the workplace is a matter of public concern"); *Moskowitz v. Coscette*, 3 Fed. Appx. 1, 4-5 (2d Cir. 2001) (holding that statements "related to actions by other officers that involved the safety of the public or corruption within the police department" were protected); *Morris*, 196 F.3d at 111 (holding that police officers' speech on "crime rates, police staffing, equipment shortages and related budgetary matters quite plainly involve matters of public concern").

Defendants argue that they are entitled to summary judgment because Plaintiff has failed to establish a causal connection between his allegedly protected speech and his termination. Therefore, according to Defendants, Plaintiff has failed to establish a prima facie case for First Amendment retaliation.  Defendants' argument on this point fails for several reasons.

As an initial matter, the Court notes that Plaintiff's termination occurred less than one month after his conversation with Mayor Degnan and Trustee Banks.  That fact alone is circumstantial evidence of causation that would be sufficient to withstand summary judgment on the issue of causation.  *Cioffi*, 444 F.3d at 168.   Here, however, Plaintiff need not rely on circumstantial evidence of causation, because Defendants openly concede that Plaintiff was terminated as a direct result of his speaking at the meeting with Mayor Degnan and Trustee Banks.

Defendants argue that "Plaintiff was not terminated for the *content* of his speech, but rather for the *way and manner* in which it was spoken, in direct violation of the VPBD's stringent enforcement of the chain-of-command policy."  Def. Mem. at 9 (emphasis added).  This argument is appropriately made to the fact-finder at trial, not by way of a motion for summary judgment, because it requires resolution of questions of an "employer's motive" and "how important a role the protected speech played in the adverse employment decision."  *Morris*, 196 F.3d at 110.  The Second Circuit has expressly held that such questions are inappropriate for summary judgment.  *Id.*  It is for a jury to attempt to "disentangl[e] the permissible from the impermissible reasons for [Plaintiff's] termination," not this Court.  *Anderson*, 614 F.Supp.2d at 431.  For this reason alone, Defendants' argument must be rejected.  A reasonable juror could find that Plaintiff's questioning the eligibility of his superior to hold his position was a

"substantial motivating factor" in that same superior's decision to terminate Plaintiff.  *Sassone*, 598 F. Supp. 2d at 467.

Moreover, Defendants' argument that Plaintiff was not terminated for the content of his speech makes little sense.  The VBPD chain of command policy does not forbid police officers from speaking on *any* matter to anyone outside the chain of command, nor could it.  Rather, according to the memoranda provided by Defendants, the chain of command policy governs only communication regarding "departmental issues."  Anesh Aff. Ex. F.[12]  Whether an employee's speech constitutes a breach in chain of command policy is thus dependent, in part, upon the content of that speech – *i.e.*, whether the speech concerned departmental issues.

Finally, Defendants' arguments that Plaintiff's alleged insubordination justified his termination, irrespective of the content of his speech, is more properly addressed in the *Pickering* balancing, which looks to whether the likely disruption of the government's activities caused by the employee's speech outweighs the value of the Plaintiff's First Amendment expression; or as a *Mt. Healthy* defense, which looks to whether the employer would have taken the same action even absent the protected conduct.  *See, e.g., Givhan*, 439 U.S. at 415 n.4 (explaining, in the context of *Pickering* analysis, that an "employing agency's institutional efficiency may be threatened not only by the content of [an] employee's message but also by the manner, time, and place in which it is delivered").  These defenses are not, however, determinative of the question of causation in establishing a prima facie case.

In any event, Plaintiff does proffer evidence that raises a triable issue of fact as to the reason for his termination.  Although Defendants now contend that the sole reason for Plaintiff's

---

[12] A memorandum circulated after Plaintiff's meeting states more directly, "At no time will any [department] member go outside of the department with internal police matters."  Anesh Aff. Ex. F.

termination was insubordination due to his breach of the Chain of Command policy, Plaintiff proffers testimony and other evidence that cast doubt on this assertion.  At his deposition, Chief Mancone initially claimed that he decided to terminate Plaintiff's job because his internal complaints were creating "friction" within the VBPD.  Gould Aff. Ex. 3, Mancone Dep. at 85.  Only after looking at documents sent to the DOL did he testify, "looking at this, the main reason that Mike Pisano was terminated was breaking the chain of command of the department."  *Id.* 93.  The letter sent to Plaintiff by DOL indicates that he was terminated for insubordination because it had been "confirmed that [he] presented negative information to the Mayor about the police department *and* [he] did not properly use the written chain of command."  Gould Aff. Ex. 9 (emphasis added).  Construed in a light most favorable to Plaintiff, this inconsistent evidence is sufficient to raise a triable issue of fact as to whether it was the content of Plaintiff's speech – the "negative information" presented to the mayor – that caused his termination.

There is also a genuine issue of material fact as to the reasons behind Plaintiff's second termination in July 2007.  The witnesses' testimony as to who made the actual decision to terminate Plaintiff's job was inconsistent and conflicting.  Moreover, the purported justification that Plaintiff was terminated solely for budgetary reasons appears to be belied by the fact that the VBPD hired additional police officers after Plaintiff's termination without obtaining additional funds in the VBPD budget.  Pl. 56.1 Resp. ¶ 25.  In light of this evidence, the Court finds that there is a genuine issue of material fact as to whether Plaintiff's protected speech was a substantial motivating factor in his second termination.

Accordingly, summary judgment based on failure to show causation is DENIED.

### 4. Potential Defenses

#### a. *Mt. Healthy Defense*: Employer Would Have Taken Action Absent Protected Speech

In their arguments regarding lack of causation, Defendants appear to be making an argument based upon the principles of *Mt. Healthy*, 429 U.S. 274, although they do not cite the case or any of its progeny.  Under *Mt. Healthy*, "even if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech."  *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir. 1998) (citing *Mt. Healthy*, 429 U.S. at 287).

Such an argument is based on Defendants' claimed motivation, and justification, for firing Plaintiff, as to which material facts are in dispute.  The Second Circuit has explained that where, as here, the plaintiff's protected conduct was a "unitary event that could prompt either a permissible or an impermissible reason on the part of the defendant to act, ... claims of alleged retaliation for the exercise of a constitutional or statutory right require focusing precisely on whether the defendant acted for an impermissible reason, and not merely in response to the plaintiff's conduct."  *Greenwich Citizens Committee, Inc. v. Counties of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 33 (2d Cir.1996).

Even if Plaintiff's protected speech was a motivating factor in his termination, Defendants could argue that they acted with "dual motivation."  *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003).  Thus, Defendants could argue that Plaintiff's insubordination in addressing his speech outside the chain of command was particularly disruptive to Department morale, and separately justified his termination.  Defendants would have to show that Plaintiff "would have been terminated even absent any desire on the Defendants' part to punish him in retaliation for his allegedly protected speech."  *Anemone*, 629 F.3d at 117 (citing *Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003)).

Because there are genuine issues of material fact as to Defendants' motivation and justification for terminating Plaintiff, summary judgment on this issue is DENIED.

> **b.** ***Pickering* Balance of Speech Interest Against Potential Disruption of Government Activities**

It is possible that Defendants will be able to show at trial that even if Plaintiff's speech is protected, the disruption to the VBPD's operations caused by the alleged breach in the chain of command outweighs the value of Plaintiff's expression. *See Pickering*, 391 U.S. at 568. Defendants "bear[] the burden of demonstrating that the speech threatens to interfere with government operations." *Lewis*, 165 F.3d at 162. Defendants would have to show that "the complained-of disruption [is] real, and not imagined." *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009) (quoting *Allen v. Scribner,* 812 F.2d 426, 432 (9th Cir.1987)). In other words, Defendants would need to submit evidence establishing that the alleged breach in the chain of command policy was sufficiently disruptive to justify Plaintiff's termination. *See Robinson*, 566 F.3d at 824 (denying summary judgment where police department claimed that breach in chain-of-command created disruption that outweighed plaintiff's First Amendment interests, because there were genuine factual disputes regarding "extent of potential workplace disruption and whether the justifications Defendants assert for their actions were pretextual"); *Brockell v. Norton,* 732 F.2d 664, 667 (8th Cir. 1984) (holding that courts cannot "decide in the abstract, however, that a chain-of-command policy designed to protect [a police department's] interest will always take precedence over the interest of a public employee in open communication" and "must look to the particular circumstances of each case to determine the importance of enforcing the chain of command against an employee whose speech breaches that policy").

In any event, because neither party has moved for summary judgment on this ground (nor has any party submitted any specific evidence or argument regarding this balancing), summary judgment would be inappropriate on this issue.

### C.    *Monell* **Liability of the Village**

#### 1.    **Applicable Law**

In order to establish the liability of a municipality under Section 1983, a plaintiff must show that a deprivation of constitutional rights occurred as a result of an official municipal policy or custom. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable under § 1983 on *respondeat superior* theory.").

To establish that an action was made pursuant to municipal policy, it is not necessary to show the existence of an explicitly stated rule or regulation. A local government may be sued for "constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's official decision-making channels." *Id.* A plaintiff may also establish the custom or policy by showing that the municipality, alerted to the possibility of unconstitutional conduct, exhibited deliberate indifference. *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). *See also Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d at 123.

A municipality may be liable for a single unconstitutional act of an official if that official has final policy-making authority. *See Pembaur v. City of Cincinatti*, 475 U.S. 469, 481 (1986) (holding that "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly"); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) ("[E]ven a single action by a decisionmaker who 'possesses final authority to establish municipal policy

with respect to the action ordered' is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983" (quoting *Pembaur*, 475 U.S. at 481-82) (internal citation omitted)).

The Court must determine whether the official in question "had final policymaking authority in the particular area involved." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (citing *St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)). This is a question of law that is "dependent on the definition of the official's functions under relevant state law." *McMillian v. Monroe County, Ala.*, 520 U.S. 781, 786 (1997). *See also Jeffes*, 208 F.3d at 57 (noting that "the relevant legal materials includ[e] state and local positive law, as well as custom or usage having the force of law" (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989))). "Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy. . . . An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Rookard v. Health and Hospitals Corp.*, 710 F.2d 41, 45 (2d Cir. 1983). *See also Roe v. City of Waterbury*, 542 F.3d 31, 41 (2d Cir. 2008) ("An official acts within his official policymaking capacity when he acts in accordance with the responsibility delegated him under state law for making policy in that area of the municipality's business.").

It is not necessary for the official to have policymaking authority across the board. "Rather, with respect to the conduct challenged, he must be 'responsible under state law for making policy *in that area* of the municipality's business.'" *Jeffes*, 208 F.3d at 57 (quoting *Praprotnik*, 485 U.S. at 123); *McMillian*, 520 U.S. at 785 (noting that the inquiry is not "all or nothing," but rather whether "government officials are final policymakers for the local government in a particular area, or on a particular issue"). In cases alleging unconstitutional

employment retaliation against a municipal entity, a plaintiff may show that the constitutional deprivation was the result of a municipal policy if he can show that those involved in the alleged retaliation had final authority with regard to personnel policy. *See Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003) (finding basis for municipal liability where police commissioner "had authority to set department-wide personnel policies"); *Rookard*, 710 F.2d at 45-46 (finding liability where hospital officials possessed final authority over personnel decisions).

### 2.    Application of Law to Fact

Defendants argue that the Village of Brewster cannot be liable for any alleged unconstitutional retaliation under *Monell* because Plaintiff has not shown that he suffered a constitutional deprivation as a result of any municipal policy. This argument, which Defendants made in their 12(b)(6) motion, fails again here for the same reasons that it failed the first time.

Although municipal liability cannot be based upon the actions of a municipal official under a theory of *respondeat superior*, a single act of an official can form the basis of liability if he possesses final policy-making authority in the area involved. *Pembaur*, 475 U.S. at 480. Here, the alleged unconstitutional action consisted of Plaintiff's termination in response to his protected speech. The Village can thus be liable if the officials responsible for Plaintiff's termination had policy-making authority in the areas of police department personnel and employment.

Plaintiff submits evidence that Defendant Mancone was responsible for his termination, and that Mancone had full authority with regard to police department personnel policy. The Village's resolution that created the VBPD stated:

> BE IT FURTHER RESOLVED that the position of municipal Chief of Police be filled by Chief Alex Mancone, who shall immediately undertake for the Village

> Board through Mayor John Degnan all necessary legal, administrative, personnel
> and logistics issues for the proper training, equipping and training, equipping and
> transportation of the municipality's police department and its initial five (5) part-
> time police officers and that *Chief Mancone is hereby delegated with the
> departmental powers of hiring, discipline and termination* . . . .

Gould Aff., Ex. 12, Resolution of the Village of Brewster, Nov. 29, 2006, at 2 (emphasis added).

This constituted an express delegation of authority to create and carry out police department

personnel policy.

Plaintiff's first termination was effected by letter signed by Mancone, which advised

Plaintiff that his position was terminated "[b]y authority of the Village Board of Trustees of the

Village of Brewster . . . under color of [Mancone's] authority as Chief of Police."  Anesh Aff.,

Ex. J.  Plaintiff's second termination was effected by letter bearing Mancone's typed name as

signatory, which stated "The Village of Brewster Police Department is exceeding current

budgetary constraints and forcing us to take action to prevent overruns from occurring. . . ."

Anesh Aff., Ex. L.  This evidence demonstrates that Plaintiff's position was terminated twice by

Mancone, that Mancone "had authority to set department-wide personnel policies," *Mandell*, 316

F.3d at 385, and that Mancone's decisions "constitute[d] the municipality's final decisions."

*Rookard*, 710 F.2d at 45.

Defendants do not attempt to dispute that Mancone had final policymaking authority with

regard to police department personnel policy.  Rather, they simply argue that this case is

distinguishable from cases finding municipal liability on the basis of the acts of a policymaker

because here, unlike in those cases, there is no constitutional deprivation.  Joint Reply

Memorandum of Law Submitted in Response to Plaintiff's Opposing Papers and in Further

Support of Defendants' Joint Motion for Summary Judgment at 8-9.  For the reasons stated *supra*

in section III.B., this argument is unavailing.

Plaintiff has successfully made out a *Monell* claim against the Village of Brewster, and Defendant's motion for summary judgment on this basis is thus DENIED.

### D.   Qualified Immunity of Defendants Mancone and Degnan

#### 1.   Applicable Law

The doctrine of qualified immunity grants public officials immunity from suit for damages for acts undertaken in their official capacity, unless their conduct violates clearly established constitutional rights of which a reasonable official would have known.  *See Demoret v. Zegarelli*, 451 F.3d 140, 148 (2d Cir. 2006); *Anderson v. Creighton,* 483 U.S. 635, 637-41 (1987).   If an official's conduct violates clearly established constitutional rights, the official can still be granted qualified immunity if the Court determines that the official's actions were objectively reasonable. *See Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003).  "For a defendant to secure summary judgment on the ground of qualified immunity, he must show that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Ford v. Moore,* 237 F.3d 156, 163 (2d Cir. 2001).

#### 2.   Application of Law to Fact

Defendants unsuccessfully sought qualified immunity on their motion to dismiss, and the Court now DENIES their motion for summary judgment on the same grounds.

Defendants argue that they are entitled to summary judgment because Plaintiff has failed to establish a constitutional deprivation.  For the reasons discussed *supra*, the Court disagrees with this contention.  At the least, there are genuine issues of material fact precluding a finding that Plaintiff has not established a constitutional deprivation as a matter of law.

Defendants argue in the alternative that even if Plaintiff established a constitutional deprivation, the decision to terminate him was objectively reasonable as a matter of law. Viewing the evidence in the light most favorable to the Plaintiff, the Court is unable to conclude that "no reasonable jury . . . could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Ford v. Moore,* 237 F.3d 156, 162 (2d Cir. 2001).

The Second Circuit has held that "[t]he prohibition against suspending or terminating employees for the content of their speech has been clearly established since 1968." *Johnson*, 342 F.3d at 116-17 (citing *Munafo*, 285 F.3d at 211). *See also Skehan v. Village of Mamaroneck*, 465 F.3d 96, 107 (2d Cir. 2006) (holding that "as a general proposition . . . governmental entities may not inflict an adverse employment decision upon an exercise of [its employee's] First Amendment rights," and finding that this right was clearly established as of the period when the alleged retaliation took place), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008). This was no less true in 2007, when Plaintiff was terminated following his speech during his meeting with Mayor Degnan and Trustee Banks. A reasonable jury could thus find that Defendants' decision to terminate Plaintiff under these circumstances was objectively unreasonable.

The Second Circuit has also held that where there are factual issues as to an employer's retaliatory motive or intent, a motion for summary judgment on the basis of qualified immunity must fail. *Johnson*, 342 F.3d at 116-17 (citing *Locurto v. Safir*, 264 F.3d 154, 170 (2d Cir. 2001)). Here, as in *Johnson v. Ganim*, Defendants' true motive for terminating Plaintiff is the central factual dispute in the case. Thus, summary judgment based on qualified immunity is particularly inappropriate.

## IV.    CONCLUSION

For the reasons stated above, the Court (1) GRANTS the motion for summary judgment by Defendants Mancone, Degnan, and the Village concerning Plaintiff's speech on all issues except the issue of Chief Mancone's ineligibility to serve as Chief of the VBPD; (2) otherwise DENIES the motion for summary judgment by Defendants Mancone, Degnan and the Village dismissing the remainder of the Complaint; and (3) *sua sponte* GRANTS summary judgment in favor of Defendant Banks due to a lack of evidence of Banks' personal involvement in the alleged constitutional deprivation.

The parties shall, by April 4, 2011, submit to the Court a joint letter outlining any steps that need to be taken before the case is Ready for Trial.  The case will be deemed Ready for Trial April 28, 2011.  The parties must file a joint pretrial order by April 20, 2011.  Counsel are directed to comply with this Court's Individual Rules.  The parties shall advise the Court by April 20, 2011 whether they consent to trial of this case before a Magistrate Judge.

SO ORDERED.

Dated: New York, New York
       March 18, 2011

_____
Kimba M. Wood
United States District Judge